1
2
3
4
5
6
7

**BERMAN TABACCO**
Joseph J. Tabacco, Jr. (SBN 75484)
Nicole Lavallee (SBN 165755)
A. Chowning Poppler (SBN 272870)
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
jtabacco@bermantabacco.com
nlavallee@bermantabacco.com
cpoppler@bermantabacco.com

8
9
10
11
12
13

**LABATON SUCHAROW LLP**
Christopher J. Keller (*pro hac vice to be submitted*)
Francis P. McConville (*pro hac vice to be submitted*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
fmcconville@labaton.com

14

*Attorneys for Plaintiff*

15

**UNITED STATES DISTRICT COURT**

16

**NORTHERN DISTRICT OF CALIFORNIA**

17
18
19
20
21
22
23
24

| | |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL 60 PENSION TRUST, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> INTEL CORPORATION, ROBERT H. SWAN and GEORGE S. DAVIS, <br><br> Defendants. | **Case No.** <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

25
26
27
28

Plaintiff Plumbers and Steamfitters Local 60 Pension Trust ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of  Securities and Exchange Commission ("SEC") filings by Intel Corporation ("Intel" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION AND OVERVIEW

1.   This is a securities fraud class action on behalf of all persons or entities who purchased or otherwise acquired the publicly traded stock of Intel between January 24, 2020 and July 23, 2020, inclusive (the "Class Period").  This action is brought against Intel, its Chief Executive Officer ("CEO") Robert H. Swan ("Swan"), and its Chief Financial Officer ("CFO") George S. Davis ("Davis") (collectively "Defendants") for violations of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

2.   Intel is a technology company that designs and manufactures hardware and software for computing, networking, data storage, and communications solutions worldwide .  It has several operating segments, including the Data Center Group, Internet of Things Group, Non-Volatile Memory Solutions Group, Programmable Solutions Group, Client Computing Group, and All Other segments.

3.   The Company's most important focus is on the design and manufacture of its Intel Core processors. Its current processor is its 10-nanometer[1] portfolio of products, which, according to the Company, features a new core architecture and is expected to deliver increased graphics performance, among other things.  While the Company recently reported success in shipping its 10nm products in 2019, for years prior Intel's development of 10nm processors

---

[1] 10 nanometer or "10nm" is the size of the semiconductor manufacturing process, as is "7nm" or "5nm."

1   suffered from embarrassing manufacturing and production delays that resulted in damage to the

2   Company's reputation and the loss of market share to competitors.  However, in order to catch

3   up and regain its market position, it was imperative that Intel effectively produce and ship its

4   10nm processors by 2020.

5         4.     In an effort to rebuild its reputation and competitive position, in 2018 the

6   Company hired Jim Keller ("Keller"), an individual renowned in the tech community, as Senior

7   Vice President to lead the Company's Silicon Engineering Group, which encompasses system-

8   on-chip development and integration.  In a press release announcing the hiring of Keller,

9   Dr. Murthy Renduchintala ("Renduchintala"), Intel's Chief Engineering Officer and Group

10   President of the Technology, Systems Architecture & Client Group ("TSCG"), described Keller

11   as "'one of the most respected microarchitecture design visionaries in the industry.'"

12         5.     At the same time, however, Intel was in the process of developing its 7

13   nanometer processors—the Company's next generation processing technology—which was

14   scheduled for release in 2021.  According to Intel, its 7-nanometer technology is the next

15   generation following its 10-nanometer technology, which the Company claims offers double the

16   area efficiency of 10-nanometer products, and will offer 20% higher performance per watt.

17         6.     Throughout the Class Period, which began on January 24, 2020, Defendants

18   misrepresented the Company's business and financial condition by issuing false and misleading

19   statements regarding the Company's financial performance, and particularly the current

20   performance and production status of its 10nm products and new generation 7nm products.

21   Specifically, the Company falsely assured investors that: (i) it was accelerating production of

22   10nm products because of unexpectedly strong demand; (ii) there was nothing unusual about its

23   declining gross margin performance other than stronger 10nm demand; and (iii) the Company

24   remained "on track" with plans it had previously laid out with respect to its 7nm product and its

25   scheduled delivery in 2021.

26         7.     For example, in the Company's January 24, 2020 Form 10-K filed with the SEC

27   it stated that: "Our 10nm manufacturing process entered full production as we launched our first

28   products from this advanced technology.  We are accelerating the pace of process node

1    introductions and moving back to a 2- to 2.5-year cadence. ***We are on track to deliver our first***

2    ***7nm-based product***, a discrete GPU, at the end of 2021.[2]

3        8.    In making these representations, Defendants knew or deliberately disregarded,

4    and failed to disclose the following adverse facts about the Company's business, operations, and

5    prospects:

6            (a)    Intel's 7nm processor scheduled for release in 2021 was not on track, but

7    rather, was suffering from material production and yield defects that threatened the 2021

8    delivery and timing of the product and the Company's overall product roadmap;

9            (b)    the Company's gross margins and fiscal 2020 outlook had been adversely

10   impacted and would continue to be adversely impacted by continued acceleration of 10nm

11   production and simultaneous 7nm technology development problem;

12           (c)    Intel was reasonably likely to utilize third-party foundries in order to be

13   more competitive in 10nm and 7nm production; and

14           (d)    because of the ongoing process and production defects in the 7nm

15   products, the Company was considering material changes to its manufacturing protocols to

16   include third- party foundries – a process that Intel had long resisted.

17       9.    On June 11, 2020, the Company announced the abrupt resignation of Keller.

18   Notwithstanding, Defendants Davis and Swan continued to reassure the market that 7

19   nanometer development remained on track to debut in 2021.

20       10.    However, just a month later, on July 23, 2020, after the market closed, Intel

21   issued a press release announcing its second quarter 2020 financial results.  Despite impressive

22   revenue and earnings results, the Company shocked investors by announcing in its subsequent

23   earnings call that it had "identified a defect mode in our seven-nanometer process that resulted

24   in yield degradation," and that, as a result, the  production and development of its 7nm chips

25   was 12 months behind schedule.  The release also noted that the Company was further

26   accelerating its transition to 10nm products.

27

28       [2] Emphasis has been added unless otherwise noted.

11.     On this news, the Company's share price declined approximately 16% to close at $50.59 per share on July 24, 2020, on unusually heavy trading volume of over 182 million shares.

12.     Just days later, on July 27, 2020, the Company announced the abrupt departure of Renduchintala, its Chief Engineering Officer, and Intel's stock price declined from a close of $50.59 per share on July 24, 2020 to a close of $49.57 per share on July 27, 2020, on unusually heavy trading volume of 107 million shares.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of a national securities exchange.

## III.     INTRADISTRICT ASSIGNMENT

17.     Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Jose Division of this District is proper because a substantial part of the events or omissions, which give rise to the claims asserted herein, occurred in Santa Clara county and Intel's principal place of business is located in Santa Clara, California.

## IV.    PARTIES

18.    Plaintiff Plumbers and Steamfitters Local 60 Pension Trust purchased Intel securities during the Class Period, as described in the certification attached hereto and incorporated herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

19.    Defendant Intel Corporation is a Delaware corporation with its principal executive offices located in Santa Clara, California.  Intel's common stock trades on the NASDAQ exchange under the symbol "INTC."

20.    Defendant Robert H. Swan ("Swan") is and was at all relevant times the CEO of the Company, as well as a Director of the Company.

21.    Defendant George S. Davis ("Davis") is and was at all relevant times Executive Vice President and CFO of the Company.

22.    Defendants Swan and Davis are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

///

///

///

V.    **SUBSTANTIVE ALLEGATIONS FOR VIOLATIONS OF THE EXCHANGE ACT**

23.    On January 23, 2020, the Company issued a press release announcing its fourth quarter 2019 financial results, including revenues, earnings and gross margins, among other things.  The release stated, in relevant part:

- Record Fourth-quarter revenue was $20.2 billion, up 8 percent year-over-year (YoY).  Full-year revenue set an all-time record of $72 billion, up 2 percent YoY on data-centric growth.

- Delivered outstanding fourth-quarter earnings per share (EPS) of $1.58 ($1.52 on a non-GAAP basis).

- In 2019, Intel generated a record of $33.1 billion cash from operations and $16.9 billion of free cash flow, and returned approximately $19.2 billion to shareholders.

- Expecting record 2020 revenue of approximately $73.5 billion and first-quarter revenue of approximately $19.0 billion.

24.    Following the dissemination of the January 23, 2020 press release, the Company conducted a conference call for analysts and investors hosted by Defendants Swan and Davis. During the call, Defendants discussed Intel's fourth quarter results, including its investment in the 7nm technology – indicating that it was on track with the Company's previously reported plans.  Specifically, Defendant Swan stated, "***Our 7-nanometer remains on track** to deliver our lead 7-nanometer product, Ponte Vecchio, at the end of 2021, with CPU products following shortly after in 2022.*"

25.    Later on the call, in response to an analyst question, Defendant Swan reiterated this position: "And then last, I'd just say that our intention back in May and ***we reiterated again today is that we want to get back to a two year to 2.5 year cadence*** and shortly after launch in ***our expectations as we'll have our first 7-nanometer product launch in the latter part of 2021 with TPAs to closely follow.***  So 10 is ramping.  We'll go to 10+ for clients and ***we'll ramp 7-nanometer on a two year cadence in 2021***."

26.     Analysts reacted favorably to Defendants statements.  For example, on January 23, 2020, UBS noted that "in terms of broader narratives, there was no wavering on the 10/7nm timelines," for which UBS provided "a strong vote of confidence."

27.     The next day, January 24, 2020, Intel filed a Form 10-K with the SEC for the period ended December 28, 2019, affirming this position.  The report stated, in relevant part: "We are accelerating the pace of process node introductions and moving back to a 2- to 2.5-year cadence.  ***We are on track to deliver our first 7nm-based product***, a data center-focused discrete GPU, at the end of 2021."

28.     On that same date, January 24, 2020, J.P. Morgan stated, "In terms of product and manufacturing execution, Intel remains on track to launch multiple 10nm products . . . and the team remains on track for its first 7nm products (Ponte Vecchio) in 2021."  Later, on February 26, 2020, UBS echoed these sentiments, noting that "strategically, we believe 7nm is on track if not better."

29.     Just over a month later, at the Morgan Stanley Technology Conference on March 2, 2020, Defendant Davis stated: "So . . . we bring a lot of capability to the table for our customers, in addition to the CPU, and we feel like ***we're starting to see the acceleration on the process side that we have been talking about to get back to parity in the 7nm generation*** and regain leadership in the [5nm generation]."

30.     On April 23, 2020, the Company issued a release announcing its first quarter 2020 financial results, including revenues, earnings and gross margins, among other things. The release stated, in relevant part:

- First-quarter revenue was $19.8 billion, up 23% year-over-year (YoY). Data-centric revenue grew 34 percent and PC-centric revenue grew 14 percent YoY.

- First-quarter GAAP earnings-per-share (EPS) was $1.31, up 51 percent YoY; non-GAAP EPS of $1.45 was up 63 percent.

- Generated $6.2 billion cash from operations and $2.9 billion of free cash flow while strengthening liquidity with $10.3 billion in new debt and suspension of share buybacks.

- Expecting second-quarter revenue of $18.5 billion; GAAP EPS of $1.04 and non-GAAP EPS of $1.10; not providing full-year guidance given significant economic uncertainty.

(Footnote omitted.)

31.     Following the dissemination of the April 23, 2020 press release, the Company conducted a conference call for analysts and investors hosted by defendants Swan and Davis. During the call, Defendants discussed Intel's first quarter results, including the overall status of the development of its 10nm processor and its investment in the 7nm technology – indicating that both were on track with the Company's previously reported plans.  The Company also discussed the gross margin impact of accelerated 10nm production.

32.     In response to an analyst question, Defendant Davis noted that "*if you take COVID out of the year, we're really not seeing anything different in our basic view of gross margin dynamics, with the exception of we're seeing stronger pull-in of demand for some of our 10-nanometer products*."

33.     Defendant Swan further explained that "[w]e indicated that we plan to get back on a 2- to 2.5-year cadence, *which means in 2021*, *we'll be ramping 10-nanometer even more while we're investing in 7-nanometer that we anticipate having in the fourth quarter of 2021. [B]ut we feel like it's – we're well on track from the plans we laid out* and feel pretty good about a dynamite first quarter and an outlook for the second quarter in line or better than what we expected."

34.     Analysts reacted favorably to Defendants' statements.  For example, on April 24, 2020, UBS issued a report titled "CO2 Gross Margin Guidance Belies A Narrative That is Fully On Track, If Not Better; Maintain Buy," largely echoing Intel's sentiments and suggesting to investors that both the development of 10nm technology and the 7nm manufacturing were "totally on track."  UBS further noted that "[b]ottom line, we remain bullish here as the margin story is unchanged and the manufacturing narrative is about to gain significant momentum."

35.     On April 24, 2020, Intel filed a Form 10-Q with the SEC for the period ended March 28, 2020, affirming the previously reported financial results.  The report incorporated by reference the risk factors stated in the Company's 2019 10-K, including an acknowledgment

that the Company's key competitors engage third-party manufacturers, specifically Taiwan

Semiconductor Manufacturing Co. ("TSMC"), and a purported warning that, if Intel does not

timely introduce new process technologies with sufficient manufacturing yields, such

competition might put Intel at a competitive disadvantage and the Company's financial results

"could" be adversely affected.

36.    Specifically, Intel stated, in relevant part:

**We face significant competition . . . .**

Our products primarily compete based on performance, energy efficiency, integration, ease-of-use, innovative design, features, price, quality, reliability, security, software ecosystem and developer support, ***time-to-market, reliable product roadmap execution***, brand recognition, customer support and customization, and availability. . . .

***Most of our competitors rely on third-party foundries, such as Taiwan Semiconductor Manufacturing Company, Ltd.*** or Samsung Electronics Co., Ltd., and subcontractors for manufacture and assembly and test of their semiconductor components and products. As an IDM, we have higher capital expenditures and R&D spending than many of our "fabless" competitors.

*             *             *

To compete successfully, we must maintain a successful R&D effort, develop new products and production processes, and improve our existing products and processes, all ahead of competitors. . . . ***[T]o the extent we do not timely introduce new manufacturing process technologies that improve transistor density with sufficient manufacturing yields and operational efficiency, relative to competing foundry processes, we can face cost and product performance disadvantages***.

*             *             *

***In addition, to the extent we face delays in the timing of our product introductions, we could become less competitive and lose revenue opportunities, and our gross margin could be adversely affected*** because we incur significant costs up front in the product development stage and earn revenue to offset these costs over time.

37.    The statements set forth above were materially false and misleading, as

Defendants knew or deliberately disregarded, and failed to disclose the following adverse facts

about the Company's business, operations, and prospects:

(a)    Intel's 7nm processor scheduled for release in 2021 was not on track, but

rather, was suffering from material production and yield defects that threatened the 2021

delivery and timing of the product and the Company's overall product roadmap;

        (b)     the Company's gross margins and fiscal 2020 outlook had been adversely impacted and would continue to be adversely impacted by continued acceleration of 10nm production and simultaneous 7nm technology development problem;

        (c)     Intel was reasonably likely to utilize third-party foundries in order to be more competitive in 10nm and 7nm production; and

        (d)     because of the ongoing process and production defects in the 7nm products, the Company was considering material changes to its manufacturing protocols to include third- party foundries – a process that Intel had long resisted.

38.     On June 11, 2020, the Company issued a press release announcing the abrupt departure of Senior Vice President Keller, effective immediately, "due to personal reasons."  As discussed above, Keller had a reputation as a chip designer superstar who was hired by Intel in 2018 to help correct missteps in the Company's development of its 10nm products.  However, the press release assured investors that Renduchintala would remain on staff as the leader of a "vastly experienced" team of engineers.

39.     That same day, Defendants Swan and Davis met with analysts from Deutsche Bank to reassure investors of the status of the Company's 10nm and 7nm transition.  Following that meeting, Deutsche Bank analysts published a report titled "Takeaways from virtual NDR with CEO and CFO," stating that "Looking forward to 7nm, [Intel]'s time-line remains unchanged with a late 2021 launch."

40.     Following the June 11, 2020 disclosure of Keller's departure and defendants' virtual meeting with Deutsche Bank, Intel's stock price declined from a close of $63.87 per share on June 10, 2020 to a close of $59.70 per share on June 11, 2020, but continued to trade at artificially inflated prices above $59.00 per share.

41.     On June 20, 2020, *The New York Times* published an article titled "After 15 Years, Apple Prepares to Break up with Intel."  That article, released on the heels of the Keller resignation, explained that, while Apple had partnered with Intel and its silicon chips since 2005 to power its Macs, Apple could announce plans to replace Intel processors with chips it had designed itself.  As the article stated, "the long-term effects could still be serious for Intel."

42.     The article discussed, among other things, Intel's prior manufacturing and production delays and its inability to technologically advance at Apple's pace, stating that "Intel has stumbled badly in that industrywide race to miniaturize Intel's latest process for making chips, once expected as early as 2015, did not enter high-volume production until 2019."  The article went on to quote from Handel Jones, chief executive of International Business Strategies, a company that offers consulting services to the chip industry, who stated "Intel has fallen behind by 12 months, maybe 18 months."

43.     The article further noted that Taiwanese manufacturer TSMC, which was being used by Intel competitors like AMD, had been contracted to build Apple's new chips.

44.     On June 23, 2020, *Nikkei Asian Review* published an article titled "Apple to replace Intel processors for Mac with in-house Chips."  The article reported on the news reports of the split between Apple and Intel, noting that Apple would be introducing its new Mac by the end of 2020 with 7nm processing technology by TSMC:

> Apple is to replace Intel processors used in Mac computers with chips designed in-house, similar to those already powering iPhones, iPads and Apple Watches, in an important shift by the California-based tech giant.

> The decision is a win for Taiwan Semiconductor Manufacturing Co, the world's largest contract chipmaker, which will deepen its relationship with Apple by producing chips for the next generation of MacBooks and other Mac computers, sources told *Nikkei Asian Review*.

*     *     *

> Sources told *Nikkei* **that Apple intended to introduce its new Mac by the end of this year using TSMC's 7 nanometer process technology**, before switching to 5nm technology next year. TSMCs 5nm process is considered the world's most advanced chip manufacturing technology. . . .

> "**Apple will test this first with the 7nanometer process tech** . . . . there are still a lot of tests and trials to be done between the new CPU and the Mac operating system," a source told *Nikkei*.

## VI.     INTEL'S TRUE FINANCIAL AND BUSINESS CONDITION IS REVEALED

45.     A month later, on July 23, 2020, after the market closed, Intel issued a press release announcing its second quarter 2020 financial results.  Despite its impressive revenue and earnings results, gross margins were lower than expected, down 6.6% year over year.

46.     The Company further shocked investors by disclosing that it was accelerating the transition to 10nm products and, more importantly, that production and development of its 7nm chips was 12 months behind schedule, contrary to its previous assurances.  Specifically, the release stated: "Intel is accelerating its transition to 10nm products this year with increasing volumes and strong demand for an expanding line up."  The press release went on to state that: "The company's 7nm-based CPU product timing is shifting approximately six months relative to prior expectations.  The primary driver is the yield of Intel's 7nm process, which based on recent data, is now trending approximately twelve months behind the company's internal target."

47.     Later that day, the Company held a conference call for analysts and investors to discuss its second quarter 2020 results.  On that call, hosted by Defendants Swan and Davis, they discussed the 7nm technology delay, accelerated 10nm production, and the impact of both on Intel's expected financial performance and gross margins.  Defendants further surprised investors by disclosing that the Company was considering outsourcing production of the 7nm products to a third-party manufacturer.  In particular, Defendant Swan stated:

> We are seeing an approximate 6-month shift in our 7-nanometer-based CPU product timing relative to prior expectations.  The primary driver is the yield of our 7-nanometer process, which, based on recent data, is now trending approximately 12 months behind our internal target.  We have identified a defect mode in our 7-nanometer process that resulted in yield degradation.  We've root caused the issue, and believe there are no fundamental roadblocks.  ***But we have also invested in contingency plans to hedge against further schedule uncertainty***.  We're mitigating the impact of the process delay on our product schedules by leveraging improvements in design methodology such as die disaggregation and advanced packaging.
>
> *          *          *
>
> Ponte Vecchio [the Company's 7nm product], will now be released in late 2021 or early 2022, ***utilizing external and internal process technologies***, combined with our world-leading packaging technologies. We now expect to see initial production shipments of our first Intel-based 7-nanometer product, a client CPU, in late '22 or early '23. . . .  We will continue to invest in our future process technology road map, but we will be pragmatic and objective in deploying the process technology that delivers the most predictability and performance for our customers, ***whether that be on our process, external foundry process, or a combination of both***.

48.     Defendant Davis further explained that "Revenue came in at $19.7 billion, up 20% year-over-year and $1.2 billion higher than guide. . . .  ***Gross margin for the quarter was***

*55%*, slightly below expectations, on higher product costs from faster uptake of our 5G ASIC products, which are margin dilutive relative to the company average, and also continued acceleration of 10- nanometer products overall, partially offset by a shift of costs from cost of sales to R&D related to 7-nanometer product timing."

49.     Suspicious of the Company's shift to the aggressive acceleration of its 10nm products, one analyst challenged Swan and Davis to explain whether the acceleration was actually due to strong 10nm yields or whether the Company was really trying to offset the 7nm delays and why it was having an outsized impact on margins.  Defendant Davis responded, "***Maybe I'll just cover it in general on the margin picture for the year because it's clearly – it's having an impact there.***  The acceleration is really definitely tied to the fact that we're growing faster than we expected in 2020.  And we're – part of that growth is a higher mix on the PC side and, I would say, on the comms and 5G ASIC side, higher demand for products that are on 10-nanometer than we had forecasted for the year. . . .  It's a positive growth story in that, again, we're seeing customers attracted to the 10-nanometer products."

50.     When further questioned by the analyst as to how the Company was seeing increased demand in light of its lowered guidance for the second half of the year, Defendant Davis responded that "It's the demand for 10-nanometer products within the mix of our overall revenue."

51.     Analysts following the Company were shocked by the disclosures.  For example, on July 23, 2020, Credit Suisse issued a report discussing the 7nm delay and pointing to the resignation of Keller as potentially causing a further increase in competitive pressure:

> ***Faster 10nm ramp CY20 GM guided to 58% from 59%***, (2) higher interest expense, (3) higher tax-rate – the latter two representing 15 cents combined.  ***While [Intel']s results were NOT clean on the surface they would have been very defensible:*** (1) While 2H Rev implies significant y/y deceleration especially in DCG – 1H 43% y/y increase to 2H 8% y/y decline – it's consistent with management narrative of 1H strength and penchant to guide conservatively – average upside to last 5Qs >$1 bb, and (2) Lower profitability NT is a function of ramping 10nm 20% faster than original expectations, which is positive.  ***Unfortunately, along with results, [Intel] announced a 6 month delay in 7nm product timing due to yields which are ~12 months behind expectations – which implies 7nm GPU in late 2021/early 2022***, Client CPU in late 2022/early 2023 and Data Center CPU in 1H2023.  In addition, [Intel] spoke much more openly about outsourcing leading edge manufacturing (7nm GPU yes, 7nm CPU undecided). . . .  [D]espite the ~2-3 year delay in 10nm – ***the execution shortfall on 7nm on the heels of the Jim Keller resignation, will re-ignite concerns on competitive***

*position which will be difficult to refute and is a risk – the easy defensible narrative is [Intel]'s results are bullish for AMD.*

52.     Cowen also issued a report on the same date, titled "Yes Its [sic] That Bad; with TSMC Humming Along, 7nm Couldn't Afford to Be Pushed." That report stated, in relevant part:

Intel's 2Q beat was completely overshadowed by a 6-month 7nm CPU pushout on a 12-month manufacturing delay.  With this timeline and recent technical management shakeup, we struggle to see how Intel stifles share loss in its core markets over the next several years, making revenue/EPS growth an uphill battle.  Like in-sourcing, out-sourcing is far from zero risk.  Market Perform, PT down to $55.

**With 7nm Pushed And The Roadmap In Flux, We Struggle To See How Intel Fights TSMC-Enabled Competitors; AMD's Share Gains Will Take Time, But Now An Open-Ended Thesis**

Roadmap uncertainty on 7nm (both timing and in/out-sourcing manufacturing strategy) will leave Intel's customers and investors frustrated and simultaneously ensure that the company cannot catch TSMC-enabled competitors' (namely AMD and NVIDIA) silicon process leadership in any bounded timeframe as it stands now.  ***Management floated the idea of outsourcing core CPU silicon as a "contingency plan," a strategy many long-time Intel followers previously viewed as unthinkable***, given the irreparable harm to Intel's long-term Moore's Law differentiation vector.

By the time Intel ramps 7nm client/server silicon under its current timeline in 2H22/2023, AMD will likely be a mix of 3nm/5nm products, options available to all other Intel merchant processing competitors and to cloud SPs with their own insourcing ambitions.

53.     On July 24, 2020, Credit Suisse issued a report, titled "BitbyBit: Intel Q2 read: 7nm delays and lower capex," which remarked on the significance of the disclosure:

- ***While*** Intel reported better sales than expected (Q2: $19.7bn vs. cons at $18.5bn and Q3 guide: $18.2bn vs. cons at $17.9bn), GMs were lower (Q2: 54.8% vs. cons at 55.9% and Q3 guide: 57% vs. cons at 58%) and ***headlines were grabbed by the announcement that 7nm chip launches will be delayed by 6 months as the company is running 12 months behind its internal target due to manufacturing defect leading to yield issues***. . . .

- ***Intel 7nm delayed by 6 months and lower capex plans.  Intel now expects to launch its first 7nm chips for GPU in late 2021/early 2022***, Client CPU in late 2022/early 2023 and Datacenter CPU in 1H23 – all of which are 6 months behind the target announced during 2019.  However, given the challenges and multiple delays it faced in 14nm to 10nm transition over the last 2-3 years, ***it remains unclear whether 7nm will be back on track after this initial delay or may lead to further roadblocks. Further, Intel also lowered its capex guidance to $15bn (-7% yoy) for 2020 due to plans for a bit higher spend on 10nm and lower spend on 7nm (from $17bn announced in Jan this year, although withdrawn in*** Apr due to COVID- 19). It has spent $6.7bn of capex in 1H implying another $8.3bn to be spent in 2H20.

54.    As a result of these disclosures, the Company's share price declined $9.81 per share, or 16%, from a close of $60.40 per share on July 23, 2020 to a close of $50.59 per share on July 24, 2020, on more than 182 million shares traded.

55.    Finally, on July 27, 2020, the Company announced the abrupt departure of Renduchintala, the Company's Chief Engineering Officer, within the next few days, without further explanation despite previously assuring investors that he would continue to lead a "vastly experienced" team of engineers after the departure of Keller.

56.    *The Verge* specifically connected Renduchintala's departure to the failing development of the 7nm processor, stating that "[h]is departure comes on the heels of Intel's announcement that its next-gen 7nm chips are delayed until at least 2022."

57.    Following the disclosure of Renduchintala's abrupt departure, Intel's stock price declined from a close of $50.59 per share on July 24, 2020, to a close of $49.57 per share on July 27, 2020, on 107 million shares traded.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

58.    The Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

59.    During the Class Period, Plaintiff and the Class purchased or otherwise acquired Intel securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Intel securities during the Class Period, Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.  CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased Intel publicly traded securities during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of any Defendant

who is an individual; (iii) any person who is an officer or directors of the Company during the Class Period and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Intel's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Intel shares were actively traded on the NASDAQ under the ticker symbol "INTC."  While the exact number of Class members is unknown to Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Plaintiff believes that the proposed Class has hundreds or thousands of members and is widely dispersed geographically.  Record owners and other members of the Class may be identified from records maintained by Intel and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

62.     Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in class and securities litigation.

64.     Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)     Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)     Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

1    (c)    Whether the Individual Defendants knew or recklessly disregarded that

2 their statements were false and misleading;

3    (d)    Whether the Individual Defendants are liable as "controlling persons"

4 under Section 20(a) of the Exchange Act for underlying violations of Section 10(b) of the

5 Exchange Act;

6    (e)    Whether, and to what extent, the market price of Intel securities was

7 actually inflated during the Class Period because of the material misstatements alleged herein;

8 and

9    (f)    Whether the members of the Class have sustained damages as a result of

10 the conduct complained of herein, and if so, the proper measure of such damages.

11    65.    A class action is superior to all other available methods for the fair and efficient

12 adjudication of this controversy because, among other things, joinder of all members of the

13 Class is impracticable.  Furthermore, as the damages suffered by individual Class members may

14 be relatively small, the expense and burden of individual litigation make it impossible for

15 members of the Class to individually redress the wrongs done to them.  There will be no

16 difficulty in the management of this action as a class action.

17
18 **IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

19    66.    Plaintiff is entitled to rely upon the presumption of reliance established by the

20 fraud-on-the-market doctrine in that, among other things:

21    (a)    Defendants made the public misrepresentations or failed to disclose

22 material facts during the Class Period;

23    (b)    The omissions and misrepresentations were material;

24    (c)    The Company's securities traded in an efficient market;

25    (d)    The misrepresentations alleged would tend to induce a reasonable

26 investor to misjudge the value of the Company's securities;

27

28

(e) Plaintiff and other members of the Class purchased Intel's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) Intel stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) As a regulated issuer, Intel filed periodic public reports with the SEC and/or the NASDAQ;

(h) Intel regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(i) Intel was followed by securities analysts employed by brokerage firms who wrote reports about the Company that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace.

67. As a result of the foregoing, the market for Intel securities promptly digested current information regarding Intel from all publicly available sources and reflected such information in Intel's securities price(s). Under these circumstances, all persons and entities who purchased Intel securities during the Class Period suffered similar injuries through their purchase of Intel securities at artificially inflated prices and thus, the presumption of reliance applies.

68. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Intel's securities.

69. Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the class purchased Intel's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

1      70.    Alternatively, a Class-wide presumption of reliance is also appropriate in this

2   action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S.

3   128 (1972), because the Class' claims are, in large part, grounded on the Defendants' material

4   misstatements and/or omissions.  Because this action involves Defendants' failure to disclose

5   material adverse information regarding the Company's business operations and financial

6   prospects – information that Defendants was obligated to disclose – positive proof of reliance is

7   not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the

8   sense that a reasonable investor might have considered them important in making investment

9   decisions.  Given the importance of the material misstatements and omissions set forth above,

10  that requirement is satisfied here.

## X.    NO SAFE HARBOR

12     71.    The statutory safe harbor provided for forward-looking statements under certain

13  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

14  The statements alleged to be false and misleading herein all relate to then-existing facts and

15  conditions.  In addition, to the extent certain of the statements alleged to be false may be

16  characterized as forward looking, they were not identified as "forward-looking statements"

17  when made and there were no meaningful cautionary statements identifying important factors

18  that could cause actual results to differ materially from those in the purportedly forward-looking

19  statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply

20  to any forward-looking statements pleaded herein, the Defendants are liable for those false

21  forward-looking statements because at the time each of those forward-looking statements was

22  made, the speaker had actual knowledge that the forward-looking statement was materially false

23  or misleading, and/or the forward-looking statement was authorized or approved by an

24  executive officer of Intel who knew that the statement was false when made.

25  ///

26  ///

27  ///

28

**COUNT I**
**For Violation of  Section 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

72.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.   This count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

74.   As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, and carried out a plan, scheme, and course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated there under.  Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Intel securities; and (iii) cause plaintiff and members of the Class to purchase Intel securities at artificially inflated prices.

75.   The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

76.   As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased Intel securities during the Class Period.

77.   In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the

market price for Intel securities, Plaintiff and other members of the Class purchased Intel securities at artificially inflated prices during the Class Period.  But for the fraud, Plaintiff and members of the Class would not have purchased Intel securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Intel securities decline precipitously and Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Intel securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

78.     By virtue of the foregoing, Defendants are liable to Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.  The Individual Defendants had control over Intel and made the materially false and misleading statements and omissions on behalf of Intel within the  meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

81.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to

have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

82.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XI.     PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

///

///

///

1    **XII.    JURY DEMAND**

2        Plaintiff hereby demands a trial by jury.

3    DATED:  September 15, 2020              Respectfully submitted,

4                                            **BERMAN TABACCO**

5                                            By:    _/s/ Nicole Lavallee_
6                                                    Nicole Lavallee (SBN 165755)

7                                            Joseph J. Tabacco, Jr. (SBN 75484)
                                             A. Chowning Poppler (SBN 272870)
8                                            44 Montgomery Street, Suite 650
                                             San Francisco, CA  94104
9                                            Telephone: (415) 433-3200
                                             Facsimile:  (415) 433-6382
10                                           jtabacco@bermantabacco.com
                                             nlavallee@bermantabacco.com
11                                           cpoppler@bermantabacco.com

12

13                                           **LABATON SUCHAROW LLP**
                                             Christopher J. Keller (*pro hac vice to be submitted*)
14                                           Francis P. McConville (*pro hac vice to be submitted*)
                                             140 Broadway
15                                           New York, New York 10005
                                             Telephone: (212) 907-0700
16                                           Facsimile: (212) 818-0477
                                             ckeller@labaton.com
17                                           fmcconville@labaton.com

18
                                             *Attorneys for Plaintiff*
19

20

21

22

23

24

25

26

27

28

---

## **CERTIFICATION**

I, Ronald Rosser, as Secretary of the Board of Trustees of Plumbers and Steamfitters Local 60 Pension Trust ("UA Local 60"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of UA Local 60.  I have reviewed a complaint prepared against Intel Corporation ("Intel"), alleging violations of the federal securities laws, and authorize the filing of this pleading, without waiving the right to alter the allegations in a consolidated and/or amended complaint;

2.      UA Local 60 did not purchase securities of Intel at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      UA Local 60 is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  UA Local 60 fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      UA Local 60's transactions in Intel securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      UA Local 60 sought to serve as a representative party in the following class action under the federal securities laws filed during the last three years:

*Plumbers and Steamfitters Local 60 Pension Trust v. Nielsen Holdings plc*, No. 1:18-cv-6459
(N.D. Ill.)

6.      Beyond its pro rata share of any recovery, UA Local 60 will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this  14th  day of September, 2020.

Ronald Rosser
*Secretary Board of Trustees*
*Plumbers and Steamfitters Local 60 Pension Trust*

**EXHIBIT A**

**TRANSACTIONS IN INTEL CORPORATION**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 03/10/20 | 551.00 | $51.70 | ($28,485.43) |
| Sale | 03/18/20 | -418.00 | $49.01 | $20,486.26 |
| Sale | 04/03/20 | -864.00 | $53.76 | $46,448.99 |
| Sale | 04/06/20 | -1,050.00 | $57.43 | $60,299.09 |
| Purchase | 05/15/20 | 489.00 | $57.25 | ($27,995.35) |
| Purchase | 06/04/20 | 297.00 | $62.92 | ($18,685.99) |
| Purchase | 06/09/20 | 483.00 | $63.55 | ($30,695.57) |
| Purchase | 06/25/20 | 613.00 | $58.34 | ($35,761.19) |